# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| RITA K. MORRIS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | **MEMORANDUM OPINION<br>AND RECOMMENDATION**<br><br>1:08CV307 |

Plaintiff, Rita K. Morris, brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Social Security Act (the "Act"). The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

## Procedural History

Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on June 28, 2004 (protective filing date, June 17, 2004), with an alleged onset of disability (AOD) of June 2, 2004. Tr. 67, 271-72. The applications were denied initially and upon reconsideration. Tr. 35, 36; 276, 282. Plaintiff requested a hearing de novo before an Administrative Law Judge

(ALJ). Tr. 50. Present at the hearing, held on June 1, 2006, were Plaintiff, her husband and attorney, and a vocational expert (VE). Tr. 360.

By decision dated September 7, 2006, the ALJ determined that Plaintiff was not disabled within the meaning of the Act. Tr. 18. On April 18, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, Tr. 6, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.
>
> 2. The claimant has not engaged in substantial gainful activity since June 2, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: right carpal tunnel syndrome; diabetes mellitus; mild coronary artery disease; minimal degenerative changes of the lumbar spine at L5-S1; and depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).
> . . .
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

Tr. 20-21. She continued:

> 5. After careful consideration of the entire record, the undersigned finds that the claimant, who is right hand dominat[sic], has the residual functional capacity to perform a significant range of light exertional

> activity with the following limitations: lift/carry 20 pounds occasionally and 10 pounds frequently; stand six hours in an eight hour day; walk six hours in an eight hour day; fingering and handling using the right hand limited to frequently (1/3 to 2/3 of an eight-hour day[)]; unlimited fingering and handling using the left hand; pushing/pulling 20 pounds occasionally and 10 pounds frequently; occasional climbing of stairs and ramps (up to 1/3 of an eight-hour day); occasional balancing; avoid exposure to workplace hazards such as dangerous machinery and working at unprotected heights; occasional interaction with the public; limited to simple, routine, repetitive tasks; andunable [sic] to work at a production work involving piece work.

Tr. 22.

The ALJ found that Plaintiff was unable to perform her past relevant work. Tr. 28. Born on October 30, 1956, Plaintiff was forty-seven years old at her AOD, regulatorily defined as "a younger individual age 45-49." Id. (citing 20 C.F.R. §§ 404.1563 and 416.963). The ALJ found that Plaintiff has a limited education and can communicate in English. Tr. 29. She added that transferability of job skills was not an issue in the case. Based on these factors, Plaintiff's residual functional capacity (RFC), and the VE's testimony, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." Id. (citing 20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), and 416.966). Accordingly, the ALJ decided that Plaintiff was not under a "disability," as defined in the Act, from June 2, 2004, through the date of her decision. Tr. 30.

**Analysis**

In her brief before the court, Plaintiff argues that the Commissioner's findings are in error because the ALJ failed to adequately assess the severity of her left

3

upper extremity and heart impairments. The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

Scope of Review

The Act provides that, for "eligible"[1] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).[2]

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration ("SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's listing of impairments,[3] (4) has an impairment which prevents past relevant work,

---

[1] Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C. § 1382(a).

[2] The regulations applying these sections are contained in different parts of Title 20 of the Code of Federal Regulations (C.F.R.). Part 404 applies to federal old-age, survivors, and disability insurance, and Part 416 applies to supplemental security income for the aged, blind, and disabled. Since the relevant portions of the two sets of regulations are identical, the citations in this report will be limited to those found in Part 404.

[3] The "Listings," found at 20 C.F.R. part 404, subpart P, Appendix 1 (part A), "is a
(continued...)

and (5) has an impairment which prevents him from doing any other work. Section 404.1520.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964).

---

[3] (...continued)
catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.'" Bennett v. Sullivan, 917 F.2d 157, 160 (4th Cir. 1990) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)). When a claimant satisfies a Listing by meeting all its specified medical criteria, he presumably qualifies for benefits. See id.

If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Issues

1. Left Upper Extremity

Plaintiff complains that the ALJ erred in failing to find that she had "severe" carpal tunnel syndrome ("CTS") in her left wrist. According to Administration practice, an impairment is "not severe" if it is only "a slight abnormality . . . that has no more than a minimal effect on the ability to do basic work activities." Social Security Ruling (SSR) 96-3p, 61 Fed. Reg. 34468-01, 34469. See also section 404.1520(c). The Regulations define "basic work activities" to include the physical functions of lifting, pushing, pulling, reaching, carrying, and handling. § 404.1521(b). During the severity assessment, the adjudicator is required to make "a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms)." SSR 96-3p, 61 Fed. Reg. at 34469.

Indeed, Plaintiff alleged on her Disability Report that she was limited by, inter alia, "nerve damage in left hand up to neck." Tr. 81. Her records, however, fail to include either objective or subjective evidence that she suffered from CTS in her left wrist which affected her ability to perform basic work activities. See section 404.1512(c) (a claimant must provide medical evidence that she had an

impairment and how severe it was). CTS is defined in Stedman's Medical Dictionary (28th ed. 2007) [hereinafter, "Stedman's"], as

> the most common nerve entrapment [syndrome], characterized by paresthesias, typically nocturnal, and sometimes sensory loss and wasting in the median nerve distribution in the hand; . . . due to chronic entrapment of the median nerve at the wrist within the carpal tunnel.

Id. at 1892.

Plaintiff acknowledges the ALJ's use, to support her finding, of the only objective study in the medical records. See Tr. 21. The ALJ cited Plaintiff's February 2003 evaluation for "complaints of bilateral hand and wrist pain with paresthesias." Tr. 113. The neurologist wrote that "[e]lectrodiagnostic studies today confirm moderately severe *right* [CTS]. *Remainder of upper extremity nerve conduction studies are normal.*" Id. (emphases added). He added, "No electrodiagnostic evidence of left carpal tunnel is seen today." Id.

Plaintiff complains of the ALJ's reliance on a study that pre-dates her AOD but, as the ALJ observed, "The record reflects few if any clinical findings regarding the left upper extremity." Tr. 21. When Plaintiff was hospitalized in July 2003, the examination of her upper extremities revealed two-plus pulses, five-of-five strength, intact sensation, full range of motion, and no edema. Tr. 121.

When back in the hospital the next month, Plaintiff reported no myalgias, arthralgias, or paresthesias. Tr. 128. There were no joint effusions, and she moved her extremities well. Tr. 129. Plaintiff followed-up with Dr. Randall Keith, her

7

primary care physician, ten days later and was "back working, feeling pretty good." Tr. 156. The doctor observed no edema in her extremities.

In September 2003, Plaintiff saw her cardiologist in follow-up, and her complaints included "some discomfort in her arms," which she attributed to CTS. Tr. 138. Yet Plaintiff was working full-time for Food Lion (as a cashier, see, e.g., Tr. 82). Her extremities revealed no edema, and her pulses were intact. When Plaintiff complained to Dr. Keith the next month of "some numbness," he attributed it to her diabetes mellitus. Tr. 156.

Plaintiff returned to the hospital in October 2003 with viral symptoms. See Tr. 142. Her "Review of Systems" listed "diffuse muscle aches and pains" but specified "occasional tingling of her *right* hand related to her [CTS]." Tr. 143 (emphasis added). Plaintiff's musculoskeletal exam revealed five-of-five strength throughout and her extremities showed no edema.

Several months later, in February 2004, Plaintiff specifically complained of "some numbness" in her left arm, but she was also having pain in her left neck, and she told Dr. Keith that it was "her nerves." Tr. 156. Dr. Keith found "good pulses" in her left arm and no obvious point tenderness anywhere. He diagnosed Plaintiff with neurological pain, again, possibly related to her diabetes. The doctor gave Plaintiff samples of Neurontin and instructed her to call back with a progress report. Although Plaintiff returned the next month, she complained only of ear pain and a shingles recurrence. Tr. 155.

Plaintiff did have another complaint, of left arm paresthesias, in June 2004, along with facial numbness and generalized weakness. See Tr. 195. It is apparent, however, that the emergency room personnel did not suspect CTS as they administered both a chest x-ray and a head computerized tomograph; these were both negative. See Tr. 200, 201. Further, Plaintiff's extremities were non-tender with full range of motion. Tr. 196.

Plaintiff's next examination was by Dr. Maqsood Ahmed, on behalf of the state Disability Determination Services. See Tr. 175. Plaintiff told Dr. Ahmed that she had constant sharp, aching pain in her hand, but then rated the pain at only three on a ten-point scale. Tr. 176. She also complained of numbness in her hand. Tr. 177. Plaintiff explained that she used a splint, which helped. And, as noted by Defendant, Plaintiff's statements regarding numbness and use of a splint utilized a single reference, not multiples. Further, Dr. Ahmed wrote, "She reports she has no conduction study which confirms that she has [CTS]." Tr. 176.

Upon examination of Plaintiff's extremities, Dr. Ahmed found two-plus pulses, no edema, full range of motion, and muscle strength equal to five of five. Tr. 178. Plaintiff's reflexes were two of four and symmetrical. The doctor also found, however, that Plaintiff's sensations were less than intact in the median nerve

9

distribution, her hands had decreased sensation, and the Phalen's test[4] was positive in both hands. Nevertheless, she was able to perform dexterous movement.

Dr. Ahmed concluded that Plaintiff's neurological exam was "unremarkable" aside from the positive Phalen's test and "decreased special sensation." Id. He diagnosed Plaintiff with a *history* of CTS and thought she would benefit from injections rather than carpal tunnel surgery. The doctor believed that Plaintiff's prognosis was "good," with medical management. Id.

Based on Plaintiff's medical records from February 2003 and Dr. Ahmed's report, see Tr. 246, a state agency expert opined that Plaintiff should be able to engage in unlimited reaching and frequent, but not continuous, manipulations, Tr. 242. A second expert, taking into consideration Plaintiff's records through December 2004, agreed. See Tr. 224. There is no indication that Plaintiff thereafter saw a physician through her June 2006 hearing.

Plaintiff contends that Dr. Ahmed's diagnosis is enough "to establish the existence of a medically determinable impairment." Pl.'s Br. at 7. The court has no dispute with this argument, but a mere diagnosis of a condition is not enough to prove severity. See Gross v. Heckler, 785 F.2d 1163, 1165-66 (4th Cir. 1986). She continues: "With symptoms including pain and numbness in both hands, the impairment *can be expected* to limit the use of Plaintiff's hands, thereby causing a

---

[4] A "Phalen maneuver" is performed when the wrist is maintained in volar flexion. Paresthesia occurring in the distribution of the median nerve within 60 seconds *may be* indicative of CTS. See Stedman's at 1151.

10

*significant* physical limitation of her ability to do basic work activities." Pl.'s Br. at 7 (emphases added). Neither the ALJ, nor this court, however, can rely on Plaintiff's post-decision reasoning; Plaintiff must rely, as did the ALJ, on the record as it stands at the time of the fact finder's decision. Cf. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (the applicant bears the burden of production and proof during the first four steps of the inquiry).

As summarized above, Plaintiff's medical records fail to reveal that her left wrist complaints imposed limitations on her ability to push, pull, lift, carry, reach or handle. Plaintiff's Brief focuses on her status after her upper extremity testing, yet she sought help with left upper extremity difficulty *only once* during the relevant period. See Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (the failure to seek help constitutes a reason for discounting subjective claims). There is no evidence that Plaintiff received medication, an appliance, or therapy for her left upper extremity. See, e.g., Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000) ("A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications."). Even Dr. Ahmed's examination revealed five of five strength, and he found that Plaintiff could perform dexterous movements. Plaintiff told the

11

Case 1:08-cv-00307-TDS-WWD   Document 13   Filed 08/17/09   Page 11 of 19

disability transcriber that she stopped working, not because of difficulty with her hands, but because "it was hard for me to see to handle [the] cash register."[5] Tr. 82.

Plaintiff's testimony further fails to support her claim of severe left CTS. When her attorney asked her to "tell me a little bit about the [CTS]," Plaintiff replied, "[I]t's in this *right wrist* here." Tr. 371 (emphasis added). Plaintiff did not testify as to any complaints in her left upper extremity. When questioned about why she could not work, Plaintiff blamed her inability to "handle a lot of people," her back and leg pain, and that she "can't think right no more." Tr. 380. She never mentioned CTS, either right or left, or any other upper extremity difficulty. The burden of production is on Plaintiff to show that an impairment is severe. Because Plaintiff did not carry her evidentiary burden, the court will not remand on this basis.

2. Cardiac Impairment

At the time of her AOD, Plaintiff had established cardiac artery disease ("CAD"), see, e.g., Tr. 118, which the ALJ found was severe. Yet, as the ALJ explained,

> The claimant's [CAD] appears fairly mild. Although she has been treated with nitroglycerin on a few occasions for symptoms of angina, the evidence does not indicate that her angina is severe. A psychiatrist who examined the claimant on October 13, 2005 specifically noted that the claimant "denies any history of angina and says that she used to take nitroglycerine in the past, but no longer needs that medication now" [Tr. 250]. The record shows that the claimant has a normal

---

[5] Plaintiff testified that she left the job because "people would get on my nerves." Tr. 365. Plaintiff told Dr. Ahmed that "she was not getting enough hours and, due to her sickness, they got rid of her." Tr. 177.

12

> ejection fraction and no evidence of significant ischemia. A cardiac catheterization in August 2003,[6] while showing lesions in two minor coronary arteries, did not show narrowing as described in Listing 4.04C [Tr. 127].

Tr. 21 (footnote added). Plaintiff does not disagree with the ALJ's reasoning, but argues that it is based on outdated information, and does not reflect the severity of her CAD during the relevant period.

The problem with Plaintiff's argument is that there is no requirement that the fact finder assign degrees of severity; accordingly, there is no reason to remand so that the ALJ can assign some other adjective to her CAD rather than "fairly mild." To the extent, however, that Plaintiff suggests that a "more severe" CAD would necessarily lead to a reduced RFC finding, her new evidence does not mandate a remand.

The disability claimant must shoulder the burden of proving his RFC:

> You must provide medical evidence showing that you have an impairment(s) and how severe it is *during the time you say that you are disabled.* You must provide evidence, without redaction, showing how your impairment(s) *affects your functioning* during the time you say that you are disabled, and any other information that we need to decide your claim.

Section 404.1512(c) (emphases added). See also section 404.1545(a)(3) ("In general, you are responsible for providing the evidence we will use to make a finding about your [RFC]."). Thus, a finding of severity does not mandate a finding of disability, but rather leaves the ALJ with the task of determining to what extent the

---

[6] This should be *July* 2003. See Tr. 118; see also Tr. 127.

13

severe impairment restricts the claimant's ability to work.  Oldham v. Astrue, 509 F.3d 1254, 1257 (10th Cir. 2007).

Plaintiff had her hearing on June 1, 2006.  On November 10, 2006, she went to the hospital with recurrent angina.[7]  See Tr. 306.  She "ruled out" for a myocardial infarction (heart attack), but an exercise stress echocardiogram ("ECG") was deemed positive.  As a result, Plaintiff underwent a cardiac catheterization (passage of a catheter), which showed blockages, only two of which were subsequently stented.[8]  And when she was discharged on November 14, 2006, she was "asymptomatic and ambulating well without problems."  Id.

The new records submitted by Plaintiff to the Appeals Council do not show that Plaintiff's more obstructive CAD had more of an "effect on [her] ability to do basic work activities" (severity).  SSA uses criteria from "exercise tests," such as the treadmill test that Plaintiff underwent, in its Listing for the cardiovascular system.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 (pt. A) [hereinafter cited to as "The Listings"] § 4.00C3b.  The Listing explains that such testing may be done "to evaluate the severity of your [CAD]" and "is the most widely used testing for . . . estimating

---

[7]  The Listings define "angina pectoris" as "[c[hest discomfort of myocardial ischemic origin."  Id. section 4.00E.2.a.

[8]  The placement of a "thread, rod, or catheter, lying within the lumen of a tubular structure, used to provide support during or after repair or anastomosis, or to ensure patency of an intact but contracted lumen."  Stedman's at 1833.

14

maximal aerobic capacity (usually expressed in METs – metabolic equivalents) if you have heart disease." Id. section 4.00C3a.

In *functional* criteria, Plaintiff's November 2006 ECG, see Tr. 329, 333, did not differ radically from her most recent pre-hearing ECG in March 2004,[9] see Tr. 151-53:

| Test Criteria | 3/04 | 11/06 |
|---|---|---|
| Maximum heart rate | 157 (91%) | 151 (89%) |
| Maximum systolic blood pressure | 154 | 202 |
| Maximum diastolic blood pressure | 90 | 100 |
| Maximum work load | 7.9 | 9.4 |
| Ejection Fraction[10] | 55% | 67% |

---

[9] Some 9 months later, Plaintiff reported to the emergency room with complaints of intermittent chest pain, but as noted by the ALJ, she refused to be admitted and left against medical advice. Tr. 189-90; see also Tr. 27. Her ECG showed a normal sinus rhythm and a heart rate of 88. Tr. 190.

[10] "Left ventricular ejection fraction" is

> the [fraction] of the blood contained in the ventricle at the end of diastole that is expelled during its contraction, i.e., the stroke volume divided by end-diastolic volume, normally 0.55 (by [ECG]) or greater; with the onset of congestive heart failure, the ejection fraction decreases, sometimes to 0.10 or even less in severe cases."

Stedman's at 769.

15

During both tests, Plaintiff experienced normal sinus rhythm[11] and no arrythmias (irregular heartbeats), compare Tr. 153 with Tr. 329, and had normal left ventricular function, Tr. 152, 333.  The conclusion in March 2004 was that Plaintiff had no ischemia,[12] Tr. 152, while the November 2006 test was only borderline for ischemia, Tr. 329.

Plaintiff's new records also do not show that, by the time of the ALJ's decision, her CAD had an effect on her "functioning" – her RFC.  SSA defines RFC as

> what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.

SSR 96-8p, 61 Fed. Reg. 34474-01, 34475.  As further explained by SSA, "The assessment of RFC must therefore be concerned with the impact of a disease process or injury on the individual."  Id. n. 5.  Plaintiff's records after March 2004 – including those from November 2006 – fail to support such an impact by her CAD, and there is *no* evidence, as Plaintiff argues, that her more severe CAD "manifested prior to the date of the [June 2006] hearing."  Pl.'s Br. at 10.

---

[11]  "[N]ormal cardiac [rhythm] proceeding from the sinoatrial node; in healthy adults its rate is 60-90 beats [per minute]."  Stedman's at 1694.

[12]  The Listings explain that "ischemic heart disease" generally "results when one or more of your coronary arteries is narrowed or obstructed."  The Listings, § 4.00E1.

Plaintiff saw Dr. Ahmed for her consultative examination some four and one-half months after her March 2004 treadmill test.  She told him that as long as she takes her medication, her blood pressure stays under control.  Tr. 176.  Plaintiff told the examiner that she experienced chest pain only "once in a while," for "about a minute or so."  Id.  Nitroglycerin helped the pain.

Dr. Ahmed noted that Plaintiff had no history of palpitation,[13] orthopnea,[14] or chronic heart failure.[15]  His examination revealed a blood pressure of 127/78, a pulse of 86, and a heart with regular rate and rhythm, without murmur.  Tr. 177-78.  Dr. Ahmed deemed Plaintiff's CAD "mild" and "stable with nitroglycerin use," and he labeled her prognosis as "good with medical management."  Tr. 178.

In December 2004, Plaintiff went to the emergency room with a complaint of intermittent chest pain, but declined to be admitted.  Tr. 189-90.  Thereafter, she did not have another CAD-related visit until November 2006 – almost two years later.  As the ALJ noted, in October 2005, Plaintiff told a mental health worker that she had no history of angina and, although she used to take nitroglycerin, she no longer needed it.  Tr. 27; see also Tr. 250.

---

[13]  "Forcible or irregular pulsation of the heart, perceptible to the patient, usually with an increase in frequency or force, with or without irregularity in rhythm."  Stedman's at 1408.

[14]  "Discomfort in breathing that is brought on or aggravated by lying flat."  Stedman's at 1383.

[15]  Defined in the Listings as "the inability of the heart to pump enough oxygenated blood to body tissues."  The Listings, § 4.00D1a.

17

Moreover, there is no showing that, in the interim, Plaintiff suffered increased symptoms or decreased functionality. At the time of her hearing, Plaintiff testified that she could not work because of her inability "to handle a lot of people" and to "function," and because of back and leg pain. Tr. 380. At no point did Plaintiff testify as to her CAD and its effect on her functioning.

Evidence considered by the Appeals Council and incorporated into the administrative record must be reviewed by this court in determining whether the Commissioner's final decision is supported by substantial evidence. Wilkins v. Secretary, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991). Plaintiff's November 2006 medical records fail to undermine the ALJ's decision as to her ability to engage in basic work activities or as to her capacity to perform work-related physical and mental activities. Accordingly, the court finds no need to remand.

Defendant also makes the cogent point that, based on Plaintiff's second disability application, dated November 16, 2006, the Commissioner found her to be disabled, *but not until February 26, 2007.* See Tr. 7. The court does not know, on this second application, from what date Plaintiff alleged disability. But the finding of not disabled would date from this AOD through February 25, 2007, and would be res judicata for such period and, thus, conclusive.[16] Further, that the Commissioner

---

[16] This is assuming, of course, that Plaintiff did not appeal the decision on her second disability application.

determined that Plaintiff was *not* disabled prior to February 25, 2007, based in part on her November 2006 records, lends support to this court's decision that the ALJ would not have changed her decision which covered an even earlier period.

**Conclusion and Recommendation**

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence and the correct legal principles were applied. Therefore, **IT IS RECOMMENDED** that the Commissioner's decision finding no disability be **AFFIRMED.** To this extent, Plaintiff's motion for summary judgment (docket no. 9) seeking a reversal of the Commissioner's decision should be **DENIED,** Defendant's motion for judgment on the pleadings (docket no. 11) should be **GRANTED**, and this action should be **DISMISSED** with prejudice.

WALLACE W. DIXON
United States Magistrate Judge

August 17, 2009