# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RITA K. MORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | **ADDENDUM TO** |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | 1:08CV307 |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Rita K. Morris, has filed objections to the court's Memorandum Opinion and Recommendation (hereinafter, the "Recommendation"). The court concedes that it inadvertently responded to an issue that Plaintiff did not present.[1] Accordingly, the discussion in the Recommendation at "1. Left Upper Extremity" will be replaced with the following.

1. Left Upper Extremity

Plaintiff complains that the ALJ erred in failing to find that she had carpal tunnel syndrome ("CTS") in her left wrist. Plaintiff acknowledges the ALJ's use, to support her finding, of the only objective study in the medical records. See Tr. 21. The ALJ cited Plaintiff's February 2003 evaluation for "complaints of bilateral hand and wrist pain with paresthesias." Tr. 113. The neurologist wrote that "[e]lectrodiagnostic studies today confirm moderately severe *right* [CTS]. *Remainder*

---

[1] The court's confusion resulted from Plaintiff's proposal that left carpal tunnel syndrome "therefore meets the definition of a severe impairment under 20 CFR §§ 404.1521(a) and 416.921(a)." Pl.'s Br. at 7.

*of upper extremity nerve conduction studies are normal.*" Id. (emphases added). He added, "No electrodiagnostic evidence of left carpal tunnel is seen today." Id.

Plaintiff complains of the ALJ's reliance on a study that pre-dates her AOD but, as the ALJ observed, "The record reflects few if any clinical findings regarding the left upper extremity." Tr. 21. When Plaintiff was hospitalized in July 2003, the examination of her upper extremities revealed two-plus pulses, five-of-five strength, intact sensation, full range of motion, and no edema. Tr. 121.

When back in the hospital the next month, Plaintiff reported no myalgias, arthralgias, or paresthesias. Tr. 128. There were no joint effusions, and she moved her extremities well. Tr. 129. Plaintiff followed-up with Dr. Randall Keith, her primary care physician, ten days later and was "back working, feeling pretty good." Tr. 156. The doctor observed no edema in her extremities.

In September 2003, Plaintiff saw her cardiologist in follow-up, and her complaints included "some discomfort in her arms," which she attributed to CTS. Tr. 138. Yet Plaintiff was working full-time for Food Lion (as a cashier, see, e.g., Tr. 82). Her extremities revealed no edema, and her pulses were intact. When Plaintiff complained to Dr. Keith the next month of "some numbness," he attributed it to her diabetes mellitus. Tr. 156.

Plaintiff returned to the hospital in October 2003 with viral symptoms. See Tr. 142. Her "Review of Systems" listed "diffuse muscle aches and pains" but specified "occasional tingling of her *right* hand related to her [CTS]." Tr. 143

2

(emphasis added). Plaintiff's musculoskeletal exam revealed five-of-five strength throughout and her extremities showed no edema.

Several months later, in February 2004, Plaintiff specifically complained of "some numbness" in her left arm, but she was also having pain in her left neck, and she told Dr. Keith that it was "her nerves." Tr. 156. Dr. Keith found "good pulses" in her left arm and no obvious point tenderness anywhere. He diagnosed Plaintiff with neurological pain, again, possibly related to her diabetes. The doctor gave Plaintiff samples of Neurontin and instructed her to call back with a progress report. Although Plaintiff returned the next month, she complained only of ear pain and a shingles recurrence. Tr. 155.

Plaintiff did have another complaint, of left arm paresthesias, in June 2004, along with facial numbness and generalized weakness. See Tr. 195. It is apparent, however, that the emergency room personnel did not suspect CTS as they administered both a chest x-ray and a head computerized tomograph; these were both negative. See Tr. 200, 201. Further, Plaintiff's extremities were non-tender with full range of motion. Tr. 196.

Plaintiff's next examination was by Dr. Maqsood Ahmed, on behalf of the state Disability Determination Services. See Tr. 175. Plaintiff told Dr. Ahmed that she had constant sharp, aching pain in her hand, but then rated the pain at only three on a ten-point scale. Tr. 176. She also complained of numbness in her hand. Tr. 177. Plaintiff explained that she used a splint, which helped. But, as noted by Defendant,

3

Plaintiff's statements regarding numbness and use of a splint utilized a single, rather than a multiple, reference. Further, Dr. Ahmed wrote, "She reports she has no conduction study which confirms that she has [CTS]." Tr. 176.

Upon examination of Plaintiff's extremities, Dr. Ahmed found two-plus pulses, no edema, full range of motion, and muscle strength equal to five of five. Tr. 178. Plaintiff's reflexes were two of four and symmetrical. The doctor also found, however, that Plaintiff's sensations were less than intact in the median nerve distribution, her hands had decreased sensation, and the Phalen's test[2] was positive in both hands. Nevertheless, she was able to perform dexterous movement.

Dr. Ahmed concluded that Plaintiff's neurological exam was "unremarkable" aside from the positive Phalen's test and "decreased special sensation." Id. He diagnosed Plaintiff with a *history* of CTS and thought she would benefit from injections rather than carpal tunnel surgery. The doctor believed that Plaintiff's prognosis was "good," with medical management. Id. There is no indication that Plaintiff thereafter saw a physician through her June 2006 hearing.

Plaintiff's testimony further supports the ALJ's implied conclusion that Plaintiff did not suffer from left CTS. When her attorney asked her to "tell me a little bit about the [CTS]," Plaintiff replied, "[I]t's in this *right wrist* here." Tr. 371 (emphasis added). Plaintiff did not testify as to any complaints in her left upper extremity.

---

[2] A "Phalen maneuver" is performed when the wrist is maintained in volar flexion. Paresthesia occurring in the distribution of the median nerve within 60 seconds *may be* indicative of CTS. See Stedman's at 1151.

4

The ALJ noted both that Plaintiff alleged disability, inter alia, on "nerve damage in the left hand up to the neck," Tr. 22, and Plaintiff's statements that she had "aching and sharp" hand pain "most of the time," Tr. 26.[3] The ALJ also reviewed Dr. Ahmed's positive findings and diagnosis. Tr. 26, 28. Plaintiff contends that Dr. Ahmed's diagnosis is enough "to establish the existence of a medically determinable impairment," Pl.'s Br. at 7, but the doctor's diagnosis of a "history" of CTS does not indicate an ongoing issue. And, as stated by the ALJ, the record contains only a "few . . . clinical findings." Tr. 21.

Yet even if the ALJ erred in not finding that Plaintiff suffered from left CTS, such error would be harmless. As Plaintiff alludes to in her Brief, establishing the existence of a medically determinable impairment is important, but only as a prelude to a finding of severity at step two of the sequential evaluation. To find such impairment "severe," it must have "more than a minimal effect on the ability to do basic work activities." Social Security Ruling (SSR) 96-3p, 61 Fed. Reg. 34468-01, 34469. See also section 404.1520(c). The Regulations define "basic work activities" to include the physical functions of lifting, pushing, pulling, reaching, carrying, and handling. Section 404.1521(b).

Plaintiff argues that "[w]ith symptoms including pain and numbness in both hands, the impairment *can be expected* to limit the use of Plaintiff's hands, thereby

---

[3] The ALJ decided that Plaintiff was "not fully credible regarding the duration and intensity of the pain and limitations alleged." Tr. 28. Plaintiff has not challenged this finding.

causing a *significant* physical limitation of her ability to do basic work activities." Pl.'s Br. at 7 (emphases added). Neither the ALJ, nor this court, however, can rely on Plaintiff's post-decision reasoning; Plaintiff must rely, as did the ALJ, on the record as it stands at the time of the fact finder's decision. Cf. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (the applicant bears the burden of production and proof during the first four steps of the inquiry). As summarized above, Plaintiff's medical records fail to reveal that her left wrist complaints imposed limitations on her ability to push, pull, lift, carry, reach, or handle.

Plaintiff's Brief focuses on her status after her upper extremity testing, yet she sought help with left upper extremity difficulty *only once* during the relevant period. See Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (the failure to seek help constitutes a reason for discounting subjective claims). There is no evidence that Plaintiff received medication, an appliance, or therapy for her left upper extremity. See, e.g., Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000) ("A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications."). Dr. Ahmed even diagnosed Plaintiff with a "history" of CTS, indicating that the ailment posed no ongoing difficulty for her. Based on Plaintiff's medical records from February 2003 and Dr. Ahmed's report, see Tr. 246, a state agency expert opined that Plaintiff should be able to engage in unlimited reaching and frequent, but not

6

continuous, manipulations, Tr. 242.  A second expert, taking into consideration Plaintiff's records through December 2004, agreed.  See Tr. 224.

Plaintiff told the disability transcriber that she stopped working, not because of difficulty with her hands, but because "it was hard for me to see to handle [the] cash register."[4]  Tr. 82.  And again, Plaintiff's testimony supports the ALJ's findings. When questioned about why she could not work, Plaintiff blamed her inability to "handle a lot of people," her back and leg pain, and that she "can't think right no more."  Tr. 380.  She never mentioned CTS, either right or left, or any other upper extremity difficulty.

As the ALJ noted, Plaintiff's studies provided minimal objective findings of a left upper extremity impairment.  See Tr. 21.  Plaintiff "did not indicate that scanning items or operating the cash register, both of which involve the repetitive use of the hands, caused significant problems with her carpal tunnel condition."  Tr. 28.  The ALJ described Dr. Ahmed's findings that Plaintiff had five-of-five strength in her upper extremities, Tr. 26, and was able to perform dexterous movements, Tr. 28. Thus, the ALJ provided substantial evidence that Plaintiff was able to perform "unlimited fingering and handing [sic] using the left hands," Tr. 22, i.e., that Plaintiff's left upper extremity was not significantly limited by any impairment.

---

[4]  Plaintiff testified that she left the job because "people would get on my nerves." Tr. 365.  Plaintiff told Dr. Ahmed that "she was not getting enough hours and, due to her sickness, they got rid of her."  Tr. 177.

7

The burden of production was on Plaintiff to show that her left CTS, if any, actually limits use of her hands, "thereby causing a significant physical limitation of her ability to do basic work activities." As Plaintiff's records fail to show that any left upper extremity impairment significantly limited her physical ability to perform basic work activities, any error of the ALJ in failing to find such impairment would be of no moment.

> While agency decisions must be sustained, if at all, on their own reasoning, this principle does not mechanically compel reversal when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached. Where a subsidiary finding is unfounded, the court will remand the case to the agency for further consideration only if the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture.

Kurzon v. U.S. Postal Serv., 539 F.2d 788, 796 (1st Cir. 1976) (internal citations omitted), quoted in Pechatsko v. Commissioner of Soc. Sec., 369 F. Supp. 2d 909, 912 (N.D. Ohio 2004). See also Stout v. Commissioner, 454 F.3d 1050, 1055 (9th Cir. 2006) (applying harmless error when "the ALJ's error . . . was inconsequential to the ultimate nondisability determination"); Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) (citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987)) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case.") (citation omitted). Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense

8

requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Accordingly, the court refuses to remand on this basis.

**Conclusion and Recommendation**

For the foregoing reasons, it is still the considered opinion of this court that the decision of the Commissioner is supported by substantial evidence and the correct legal principles were applied. Therefore, it remains this court's **RECOMMENDATION** that the Commissioner's decision finding no disability be **AFFIRMED**. To this extent, Plaintiff's motion for summary judgment (docket no. 9) seeking a reversal of the Commissioner's decision should be **DENIED**, Defendant's motion for judgment on the pleadings (docket no. 11) should be **GRANTED**, and this action should be **DISMISSED** with prejudice.

_____
WALLACE W. DIXON
United States Magistrate Judge

September 16, 2009